UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC DOWDY-EL, AVERIS X. WILSON,          Case No. 06-11765
AMIRA SALEM, TOM TRAINI and
ROGER HUNT,                               Hon. Avern L. Cohn

        Plaintiffs,                  Magistrate Judge David R. Grand

v.

PATRICIA L. CARUSO, MICHAEL MARTIN,
and DAVE BURNETT,

        Defendants.
_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [55 AND 57]

Before the court are the parties' cross-motions for summary judgment [55] and [57], which have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [55] be **GRANTED IN PART AND DENIED IN PART**, and that Plaintiffs' Motion for Summary Judgment [57] be **GRANTED IN PART AND DENIED IN PART.**

## I.     BACKGROUND

Plaintiffs are several individuals incarcerated by the Michigan Department of Corrections ("MDOC") and housed at the G. Robert Cotton Correctional Facility in Jackson, Michigan. The operative complaint is Plaintiffs' Second Amended Class Action Complaint [37] (the "Complaint" or "Compl."), which is brought pursuant to 42 U.S.C. § 1983, and which alleges violations of Plaintiffs' rights under: (1) the Equal Protection Clause of the Fourteenth Amendment of the

United States Constitution; (2) the Free Exercise Clause of the First Amendment of the United States Constitution, (3) the Michigan Constitution's counterparts to the United States Constitution's Equal Protection Clause and Free Exercise Clause, Article I, §§ 2 and 4, respectively; and (4) the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA").

In the Complaint, five named plaintiffs allege that the defendant MDOC employees ("Defendants") violated their rights under the above federal and state constitutional provisions and RLUIPA by unlawfully restricting their religious practices. *See* Compl., ¶¶1, 5-9, 35-69. Specifically, the plaintiffs challenge the Defendants' alleged failure to accommodate certain religious practices which they allegedly must observe during particular days and times each week. *Id.*, ¶¶16-23. Plaintiffs who are Muslim also challenge the Defendants' alleged failure to accommodate their religious dietary restrictions and their observance of the *Eid ul-Fitr* and *Eid ul-Adha* Feasts (the "*Eid* Feasts") which occur annually after Ramadan. *Id.*, ¶¶24-25, 27

## A.    Accommodation of Weekly Recurring Religious Practices

Plaintiff Hunt is a Seventh-day Adventist who wishes to observe the Sabbath, which he alleges to be an integral and mandatory part of his faith, beginning at sundown on Fridays and ending at sundown on Saturdays. *Id.*, ¶¶3, 18.[1]  Plaintiffs Dowdy-El, Wilson, Salem and Traini

---

[1] Defendants claim that Plaintiff Hunt was on parole at the time the instant summary judgment motions were filed. As Defendants note, Plaintiffs' summary judgment motion does not seek any relief as to Hunt's claims. Nor does Plaintiffs' response to Defendants' motion address their arguments for dismissing Hunt's claims. In fact, the body of Plaintiffs' motion does not even mention Hunt or his specific claims. Accordingly, the court construes Defendants' Motion for Summary Judgment as to Hunt's claims as unopposed, and recommends that Defendants' Motion for Summary Judgment be granted as his claims. *See* E.D. Mich. LR 7.1(c)(1) ("A respondent opposing a motion must file a response, including a brief and supporting documents then available."). *See also, Humphrey v. United States Attorney General's Office*, 279 Fed. Appx. 328, 331 (6th Cir. 2008) ("[I]f a plaintiff fails to respond or to otherwise oppose a defendant's motion,

(hereafter, the "Plaintiffs") are Muslims who follow the teachings, beliefs and practices of Islam. *Id.*, ¶¶10, 24.   They seek to observe *Jum'ah*, a Muslim "Holy Day" that they contend is an integral and mandatory part of their faith.   *Id.*, ¶17.   *Jum'ah* is a weekly congregational prayer service that begins on Fridays at about noon and lasts for approximately one hour.   *Id.*

MDOC Policy Directive 05.03.150 (the "Policy Directive"), entitled "Religious Beliefs and Practices of Prisoners," provides generally that "[p]risoners shall be permitted to exercise their religious beliefs within the constraints necessary for the order and security of the facility."   *See* Defs.' Mot. S. J. (Doc. #55), Ex. 2.   More specifically, the Policy Directive provides that all "recognized religions shall enjoy equal status and protection, subject to those limitations necessary to maintain order and security of the facility…" and that "[n]o prisoner shall be discriminated against, or given preferential treatment, because of his/her religious beliefs or practices."   *Id.*, ¶¶C, D.   Plaintiffs' claim that, despite the Policy Directive, "Defendants have unreasonably failed to accommodate [their] weekly worship requirements by rejecting their request to be released from work or school to [attend the *Jum'ah* prayer] or to be scheduled for work or school details which do not conflict with [*Jum'ah*]."   Compl., ¶19.   Essentially, Plaintiffs seek a system that would permit them (and other inmates) to self-determine at least a portion of their daily or weekly schedules to attend certain religious services.

The Plaintiffs' proposition is generally at odds with Paragraphs V and BB of the Policy Directive, which provide:

> V.   Staff shall not make special provisions for the observance of religious holidays except as authorized and specifically provided for by Department policy.
>
> * * * *

---

then the district court may deem the plaintiff to have waived opposition to the motion.") (quoting *Scott v. State of Tennessee*, No. 88–6095, 1989 WL 72470 at *2 (6th Cir. July 3, 1989)).

> BB.     Prisoners shall not be released from work or school assignments to attend group religious services or activities, consistent with restrictions on attending other personal interest activities.  Religious services and activities should be scheduled when the majority of prisoners have leisure time (e.g., evening and weekend hours)…

Policy Directive, ¶¶ V, BB (collectively, the "Work Release Policy" or the "Policy").

Despite the Work Release Policy, the parties agree that Defendants employ an unwritten and "sporadic" "policy of granting permission to attend religious services on a case by case basis." Pls.' Mot. S.J. (Doc. #57) at 7; Doc. #58, Pl. Stmt. of Facts, ¶31 (concurred with by Defendants, Doc. #61); Doc. #57-4 ("Caruso Dep."), pp. 57-58.  Plaintiffs take exception with the fact that under the Work Release Policy, "attendance at religious services like Jum'ah [is treated] as equal to any other 'personal interest activity'…[and] Muslims such as Plaintiffs cannot attend Jum'ah without obtaining permission to exercise a 'call-out' – permission that is often denied…"  Doc. #57 at 7.  Plaintiffs allege that an inmate who refuses to attend a scheduled detail because of a conflict with a religious service, may be administratively punished in a manner that reduces his or her rights and/or creates a disciplinary record, thereby affecting the inmate's standing within the prison system.  *Id.*; Compl., ¶23.  Accordingly, Plaintiffs request "[a]ccommodation to attend a weekly, mandatory religious service on Friday [*Jum'ah*] (which service is already provided by all or most MDOC institutions) *by the institution not scheduling relevant inmates for a conflicting school, work or other detail or activity*."  *Id.*, ¶2 (emphasis added).[2]  Plaintiffs further seek reversal of any disciplinary actions previously imposed on inmates who refused to attend work or school because of a conflict with religious services.  *Id.*

---

[2] Plaintiffs also complain that Defendants have allegedly "unreasonably failed to accommodate [their] weekly worship requirements by rejecting their request to be released from work or school to worship at the times mandated by their religion…"  *Id.*, ¶19.

4

Defendants' position is that under RLUIPA, the Work Release Policy does not substantially burden Plaintiffs' religious exercise because "individuals that are incarcerated may be legitimately excused from their obligation to attend Ju'mah [sic] prayer."  Doc. #55 at 6. They defend the Work Release Policy under the First and Fourteenth Amendments on the respective grounds that Plaintiffs cannot show that the Policy is unreasonable or that Defendants purposefully discriminated against them.  Doc. #60 at 9-10, 12-13.  They also claim that that the relief sought by the Plaintiffs would pose security concerns, and that the Work Release Policy is the least restrictive and reasonable means of addressing that alleged compelling governmental interest.  *Id.* at 4; Doc. #55 at 7.

### B.    Accommodation of Religious Dietary Restrictions and the *Eid* Feasts

The Plaintiffs also challenge the Defendants' alleged failure to accommodate their religious dietary restrictions and observance of the *Eid* Feasts.  First, they allege that their faith requires adherence to dietary restrictions that prohibit the consumption of any food that is not "*halal*"[3] Compl., ¶24.  They assert that such a diet requires, among other things: that any meat products be derived only from animals that have been ritually slaughtered; that pork may never be consumed; and, that adherents must not consume any other foods prepared in a cross-contaminated kitchen where pork has been prepared or cooked.  *Id*.  Additionally, they allege that the observation of the two annual *Eid* Feasts is a central tenet of Muslim faith, recognized as high holy days in Islam.  *Id, ¶*25.

The Plaintiffs allege that, despite the fact that MDOC provides appropriate accommodations for Jewish prisoners' dietary needs (providing Kosher meals) and observances (allowing a Passover Seder), Defendants have refused to similarly accommodate Muslim inmates'

---

[3] "*Halal*" means "permissible" and "haram" means "forbidden."   Doc. #58, ¶ 56.

5

dietary requirements (*halal* meals) and observances (the *Eid* Feasts). *Id*., ¶27. Accordingly, the Plaintiffs request that MDOC be compelled to accommodate observant Muslim inmates by providing a *halal* diet and allowing them to participate in the *Eid* Feasts. *Id*., ¶2.

Defendants admit that the MDOC does not provide special *halal* meals. Doc. #55 at 9. Instead, they argue that the Plaintiffs' religious exercise is not substantially burdened under RLUIPA because they are provided "with a protein substitute that is nutritionally sufficient and meets their religious requirements" and because cost considerations do not allow for providing *halal* meals. *Id.* at 9-10; Doc. #60 at 7.[4] Defendants' First and Fourteenth Amendment arguments are that Plaintiffs cannot show any unreasonable conduct or purposeful discrimination related to the failure to provide *halal* meals. Defendants argue that the Plaintiffs' claims related to the *Eid* Feasts are moot because, on December 10, 2010, the MDOC issued a memo clarifying to all its prison facilities that the *Eid* Feasts are "religiously required observations" for Muslim inmates, and that each facility must "ensure that this minimum requirement for Muslim prisoners is met in compliance with policy…" Doc. #55, Ex. 3 (the "Memo"). Plaintiffs counter that the issue is not moot because the Memo is not binding official MDOC policy. Doc. #59 at 7-8.

## II.   <u>STANDARD OF REVIEW</u>

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[4] The court need not address the first of these defenses because the Plaintiffs make clear that they are seeking *halal* **meals**, whether or not those meals include *halal* **meat**. In other words, even if the protein substitute Defendants offer is nutritionally equivalent to meat, Plaintiffs argue that their rights are violated if that protein substitute is not *halal*, for instance, if it has been contaminated with food that is haram. Doc. #59 at 3. Thus, the real questions here are whether Plaintiffs are entitled to *halal* meals, *i.e.*, ones that are not *haram* in any respect, and whether the Defendants provide such meals, or have a lawful reason for not doing so.

Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (inquiry is whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law'"). In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting

facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id*. at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Evidentiary submissions by a party opposing summary judgment need not, themselves, be in a form that would be admissible at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). However, the opposing party must demonstrate the existence of "evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558, 561 (unauthenticated or otherwise inadmissible documents are not to be considered as support for a motion for summary judgment); *see also Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (affidavits submitted in support of a summary judgment motion must "demonstrate the personal knowledge required by Fed. R. Civ. P. 56(e)"); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) (hearsay evidence submitted in opposition to a motion for summary judgment must be disregarded).

## III.   <u>ANALYSIS</u>

The three main issues presented for the court's review are whether Defendants violated Plaintiffs' rights under RLUIPA and/or the First or Fourteenth Amendments to the U.S. Constitution[5] by: (1) not scheduling Plaintiffs to school or work details (or excusing them from conflicting details) which allow them to attend *Jum'ah* on Friday afternoons; (2) not providing Plaintiffs with a *halal* diet; and (3) not allowing Plaintiffs to participate in the *Eid* Feasts.

---

[5] Plaintiffs' filings do not specifically address their Michigan Constitution claims.   However, as the Defendants note, the same analyses that apply to Plaintiffs' federal constitutional claims also apply to their counterpart Michigan Constitution claims.   Doc. #55 at 12, 16.   *See Lucas v. Monroe County*, 203 F.3d 964, 972, fn. 4.   Accordingly, the court rejects Defendants' argument that Plaintiffs' Michigan Constitution claims should be dismissed simply because they failed to affirmatively acknowledge that well-settled principle and failed to move for summary judgment as to those claims.   Doc. #60 at 9, 12.

Defendants deny that Plaintiffs are entitled to any of the relief requested.  The court will first analyze Plaintiffs' *Jum'ah* and *halal* diet claims, before turning to their *Eid* Feasts claim.

### A.      Cross-Motions for Summary Judgment on Plaintiffs' RLUIPA Claims

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S .C. § 2000cc–1(a).  Importantly, RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A).

RLUIPA claims involve a burden-shifting framework in which the inmate bears the initial burden of persuasion of showing that: (1) the existence of a religious exercise that has been burdened by a government practice, and (2) the burden is substantial.  42 U.S.C. § 2000cc-2(b) (inmate bears the "burden of persuasion on whether the law ... or government practice that is challenged ... substantially burdens the plaintiff's exercise of religion.").  *Hayes v. Tennessee*, 424 Fed. Appx. 546, 554-55 (6th Cir. 2011).

If the plaintiff satisfies his burdens, the onus shifts to the government on the remaining elements of the RLUIPA claim: (1) that the burden furthers a compelling governmental interest, and (2) that the burden is the least restrictive means of achieving that compelling interest.  42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b).  *Hayes*, 424 Fed. Appx. at 555.  *See also Spratt v. Rhode*

*Island Dep't of Corrections*, 482 F.3d 33, 38 (1st Cir. 2007) (holding that, under RLUIPA, once a plaintiff establishes a substantial burden on the exercise of his or her religion, the "onus shifts to the government"). In short, under RLUIPA, if a governmental regulation substantially burdens a religious practice, it must meet "strict scrutiny." *Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005). Moreover, RLUIPA is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

      i.      **Plaintiffs'** *Jum'ah* **Claims and the Work Release Policy**

          a.      **The Work Release Policy Substantially Burdens a Religious Exercise**

Plaintiffs challenge the Work Release Policy as a substantial burden on their religious exercise because, to the extent their prison-scheduled work or school details conflict with the weekly Friday afternoon *Jum'ah* prayer, and no individual permission is obtained (which, at least on the Policy's face, cannot be granted), they are unable to attend the religious service. Compl. ¶¶19-20, 23; Work Release Policy, ¶¶ V, BB. Defendants' first counter-argument is that the Work Release Policy cannot, as a matter of law, "substantially burden" the Plaintiffs' ability to exercise their religion because, as inmates, Plaintiffs are excused from participating in *Jum'ah* under Islamic law. Doc. #55 at 6.

The court rejects Defendants' argument, which conflates the first two elements of the Plaintiffs' RLUIPA claim: (1) the existence of a religious exercise; and (2) a substantial burden on that religious exercise. An analysis of Defendants' principal supporting case law, *Abdur-Rahman v. Michigan Dept. of Corrections*, 65 F.3d 489 (6th Cir. 1995), and the statutory framework that existed both at that time (before RLUIPA's adoption) and now, proves the point. In

10

*Abdur-Rahman*, the plaintiff inmate claimed that a Michigan prison violated his rights under the Religious Freedom Restoration Act of 1993 ("RFRA"[6]), 107 Stat. 1488, 42 U.S.C. § 2000bb et seq., and the First Amendment to exercise his religion by refusing to release him from his work detail to attend *Jum'ah* prayer.   The Sixth Circuit explained that while prisoners retain First Amendment rights to exercise their religion, that right "may be subjected to reasonable restrictions and limitations."  *Abdur-Rahman*, 65 F.3d at 491 (citing *Bell v. Wolfish*, 441 U.S. 520, 549-51 (1979)).   The court rejected the plaintiff's claim under both the First Amendment and RFRA because it found that *Jum'ah* prayer was not a significant enough component of the Islamic religion such that a prison's wholesale prevention of the practice could not, as a matter of law, constitute a "substantial burden" on an inmate's religious practice:

> …Evidence presented by Chaplain Mardini, a religious leader and teacher of the Islamic religion, establishes that Muslims may be legitimately excused from Friday services for reasons such as sickness and work activities.   Therefore, the prison's policy did not affect an essential tenet of Rahman's religious beliefs….Not all regulations affecting religious activity fall within the [RFRA].   Only regulations which *substantially* burden a prisoner's capacity to exercise his beliefs of faith are governed by the Act.   Reasonable time, place, or manner restrictions upon communal religious gatherings do not necessitate the identification of a compelling state interest.   The testimony of Chaplain Mardini establishes that the Islamic religion expressly excuses individuals who are in prison for good cause.   Given that the Friday services are not fundamental to Rahman's religion and that the prison denied Rahman's pass to attend such services based on security reasons, the district court did not err in granting summary judgment for the defendants.

---

[6] Prior to the RLUIPA, Congress had enacted the RFRA, which was meant to address state and federal government imposition of substantial burdens on the exercise of religion.  42 U.S.C. § 2000bb(b)(1).    However, in 1997, the U.S. Supreme Court held that the RFRA was unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment.  *See City of Boerne v. Flores*, 521 U.S. 507 (1997).  Congress responded by enacting RLUIPA in 2000 to assure the application of the RFRA's "heightened statutory protection to religious exercise" to state government institutions, including state-run prisons.  *Sossamon v. Texas*, 131 S.Ct. 1651, 1655-56 (2011).

*Id.*

Here, similar testimony from the same Chaplain Mardini is offered in support of Defendants' argument that the Work Release Policy does not substantially burden Plaintiffs' religious exercise. Doc. #55-5, Mardini Aff., ¶ 7. Defendants argue that because "the Sixth Circuit ruled on language from the [RFRA] that is virtually identical to the language in the RLUIPA,"[7] this court should similarly find that the Work Release Policy cannot, as a matter of law, violate RLUIPA. Doc. #63 at 1. They further argue that "[t]here is absolutely no basis to distinguish the Sixth Circuit's interpretation of the language in the RFRA from the language in the RLUIPA." *Id. See also* Doc. #55, at 6. That argument fails, however, as RLUIPA employs a much broader definition of "religious exercise" than did the original RFRA.

The original RFRA defined "exercise of religion" as simply "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4) (1994) (repealed). However, the newer RLUIPA defines "religious exercise" to include "any exercise of religion, *whether or not compelled by, or central to, a system of religious belief.*" 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). Thus, as the Supreme Court has noted, "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion."[8] *Cutter*, 544 U.S. 709, 725 n. 13 (2005). The court, therefore, is not at liberty to make the inquiry urged by Defendants.

---

[7] *Cf.* 42 U.S.C. § 2000bb-1 (1994) ("[g]overnment shall not substantially burden a person's exercise of religion" unless such a burden is "the least restrictive means of furthering [a] compelling governmental interest" *with* 42 U.S.C. § 2000cc-1 (2000) ("No government shall impose a substantial burden on the religious exercise of [an incarcerated person] … unless the government demonstrates that imposition of the burden on that person—[is the least restrictive means of furthering a compelling governmental interest]").

[8] The Court noted that prison officials may still, under RLUIPA, conduct an inquiry into the sincerity of a prisoner's professed religiosity. *Id.*

Moreover, RLUIPA's legislative history confirms Congress' conscious desire for it to protect a wider array of religious activity than the RFRA protected.   *See e.g.*, H.R. Rep. NO. 106-219, at 30 (1999) (Religious Liberty Protection Act of 1999, a legislative predecessor of the RLUIPA) ("To trigger a claim under H.R. 1691, a religious person or organization must first demonstrate that the government has 'substantially burden[ed]' religious exercise.   The modifier 'substantially' is intended to ensure that strict scrutiny is not triggered by trivial, technical, or de minimus burdens on religious exercise.   While both Acts employ a 'substantial burden' threshold, H.R. 1691 clarifies that ***the burdened religious activity need not be compulsory or central to a religious belief system as a condition for the claim***.") (emphasis added).[9]

Thus, even accepting the Defendants' position that the Sixth Circuit has already ruled on the issue of the *Jum'ah* prayer's "centrality"[10] to the Islamic religion, that ruling would not foreclose the Plaintiffs' RLUIPA claim.   Accordingly, the Plaintiffs have met their initial burden of establishing that *Jum'ah* prayer is a religious exercise under RLUIPA.

The Work Release Policy clearly "substantially burdens" the Plaintiffs' ability to

---

[9] Defendants also cite to *Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) for the proposition that the "test for whether the state officials imposed a substantial burden is the same under the RLUIPA as it is under the RFRA."   Doc. #55 at 6.   But the cited reference is merely the Sixth Circuit's statement that "the RLUIPA is similar to the Religious Freedom Restoration Act of 1993 (RFRA) in that the court must determine whether the plaintiff is likely to succeed in demonstrating that the regulation in issue imposes a substantial burden on his religious exercise." That statement said nothing about whether a particular religious practice is covered by RLUIPA, or what restrictions might constitute a "substantial burden" on that practice.

[10] The court also notes that the Sixth Circuit's discussion of the issue in *Abdur-Rahman* was extremely limited, and that it is unclear whether the inmate in that case presented any evidence whatsoever as to the relative importance of *Jum'ah* to the Islamic religion.   Abdur-Rahman, 65 F.3d at 492.   Here, on the other hand, Plaintiffs present the expert report of Abdullah El-Amin, an Islamic Imam, who states that observant Muslim inmates must participate in Jum'ah and that the Quran does not excuse them from this obligation due to their incarceration.   Doc. #56-3, pp. 3-4. Thus, at a minimum, a material dispute of fact exists on the issue.

participate in *Jum'ah*.   Although RLUIPA does not define "substantial burden," the Sixth Circuit

has written that an action "will be classified as a substantial burden when that action forced an

individual to choose between 'following the precepts of her religion and forfeiting benefits' or

when the action in question placed 'substantial pressure on an adherent to modify his behavior and

to violate his beliefs.'"   *Barhite v. Caruso*, 377 Fed. Appx. 508, 511 (6th Cir. 2010) (quoting

*Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir.2007),

*Sherbert v. Verner*, 374 U.S. 398 (1963), and *Thomas v. Review Bd. of Ind. Employment Sec. Div.*,

450 U.S. 707, 717-18 (1981)).   Here, the Work Release Policy pressures Muslim inmates to

violate their religious beliefs by subjecting them to disciplinary action and loss of certain rights if

they skip a work or school detail to attend *Jum'ah*.   Doc. #58, ¶¶36-38.   And, affected Muslim

inmates who adhere to the Policy and attend their scheduled details are necessarily unable to

participate in the congregational *Jum'ah* prayer.   Accordingly, the Work Release Policy

substantially burdens Plaintiffs' religious exercise.   *See DiLaura v. Township of Ann Arbor*, 112

Fed. Appx. 445, 446 (6th Cir. 2002) (where city refusal to grant a variance "effectively barred the

plaintiffs from using the property in the exercise of their religion" that refusal constituted a

substantial burden); *Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d 691, 701

(E.D. Mich. 2004) ("courts routinely find substantial burdens where compliance with the

[challenged policy] violates the individual's religious beliefs and noncompliance may subject him

to criminal sanctions or the loss of a significant government privilege or benefit.").   *See also*

*Green v. Solano County Jail*, 513 F.3d 982 (9th Cir. 2008) (noting the court's "little difficulty in

concluding that an outright ban on a particular religious exercise is a substantial burden on that

exercise.") (citing *Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 988 (8th Cir. 2004) (ban on

"communal worship" substantially burdened inmate's religious exercise) and *Meyer v. Teslik*, 411

14

F.Supp.2d 983, 989 (W.D. Wisc. 2006) (same, and noting that it "is difficult to imagine a burden more substantial than banning an individual from engaging in a specific religious practice.")).

### b.    Defendants Have Identified a Compelling Governmental Interest for the Work Release Program

Defendants argue that they have a compelling governmental interest in prison security that would be compromised if they were required to release inmates from their work or school details so they could attend religious services.   Doc. #55 at 7.   In *Cutter*, the U.S. Supreme Court stated that "prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."   *Cutter*, 544 U.S. at 725 n. 13.   The *Cutter* Court focused on RLUIPA's legislative history, noting that "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions, and anticipated that the Act's "compelling governmental interest"/"least restrictive means" standards would be applied according "due deference to the experience and expertise of prison and jail administrators." *Cutter,* 544 U.S. at 717, 722-23 (citations omitted).   The Court made clear, however, that defendants in cases like this one need to do more than make bald assertions of "security concerns." *Cutter*, 544 U.S. at 725.   *See also Hoevenaar*, 422 F.3d at 371 (district court was not required to "blindly accept any policy justification offered by state officials.").

Defendants cite the testimony of Patricia Caruso[11]  and Edward Mize[12]  for the propositions that to make exceptions to the Work Release Policy for "religious reasons" "would pose a threat to

---

[11]  Since July 2003, Ms. Caruso has been the MDOC's Director, and is responsible for all facets of the State's prison system. Caruso Dep. at 3-5.   She has spent more than 24 years working for the MDOC in various capacities, including: Business Manager (and Assistant Manager); Warden at the Chippewa Correctional Facility; Regional Prison Administrator; and Deputy Director of Correctional Facilities Administration.   *Id.*, pp. 3-4.

[12]  Mr. Mize has worked in Michigan's corrections system since at least 1991.   Doc. #57-5 ("Mize

security" and could "create resentment in an already charged environment."   Doc. #55 at 7-8

(citing Caruso Dep. at 56-57, 75-77; Mize Dep. at 57, 59-60).   Defendants then give hypothetical

examples to illuminate their concerns, including prison gang members converting to a religion in

order to spend time together when they presumably would not otherwise be able to do so.   *Id.* at 8.

Their concerns are not pure speculation, as Plaintiffs suggest.   Rather, their concerns are

supported by Caruso's deposition testimony regarding a prior similar situation.   Caruso explained

that when Michigan's prisons were not tobacco-free, each facility had to designate a housing unit

that was nonsmoking.   She explained that doing so led "prisoners who for not good reasons

wanted to loft together in the same unit…quit[ting] smoking so they could loft in that same unit

and create all kinds of problems in the facility."   Caruso Dep. at 56.   Extrapolated to the instant

case, Caruso stated:

> So, if I say you must accommodate every prisoners' [sic] religious needs in
> terms of schedules, I create a very dangerous environment in that prison.   I
> have to trust the wardens and their staff to know what they can accommodate
> and what they can't and who's manipulating the system and who isn't.…If
> they have a prisoner whose entire life has sincerely held religious beliefs and
> they're making an attempt to accommodate, that's very different than Mr.
> Johnny Come Lately who has decided belonging to this religion allows [him]
> to affiliate with those characters over there and I'm never going to get near
> them if I can't be part of this religion.

*Id.* at 56-57.

---

Dep."), pp. 5-9.   He is currently the Operations Administrator for Michigan's Correction
Facilities Administration ("CFA"), a position he has held since approximately May 2007.   In that
role, Mize oversees several sections and/or section heads within the CFA, including,
"classification," food service, activities coordination (including religious services), accreditation,
emergency services, central records, and Michigan State Industries – the body which oversees
inmate labor. *Id.*, pp. 11-12.   Prior to becoming the CFA's Operations Administrator, Mize was
the CFA's Classification Director for about 20 months, was an assistant warden at the Huron
Valley Men's Facility in Ypsilanti, Michigan for approximately 8 months, and was the
Administrator of Security and Safety Services at Michigan's mental health for approximately 4
years.   *Id.*, pp. 5-6.   In that latter role, Mize was responsible for "day-today decisions on security
related matters both on the prisoners and the facility."   *Id.*, p. 10.

Mize's testimony was generally consistent with Caruso's. When asked about the feasibility of the system proposed by Plaintiffs, where inmates could, as a matter of course, choose details that did not conflict with regularly-scheduled religious services they wished to attend, Mize explained his concern that inmates "would manipulate that process to get certain individuals into certain jobs that operationally could pose a risk to the security of the facility." Mize Dep. at 35.[13]

Although Plaintiffs attack the Defendants' position as a mere "talismanic utterance" of the word "security" and unsupported "rhetoric by counsel," Doc. #59 at 10, 13, fn. 19, the foregoing shows Defendants' argument to have more substance. Caruso and Mize have a combined 44-plus years as corrections officials, each having achieved high-ranking positions. Their concerns about safety and security are logical, and are based not only on their past general experience in prison administration, but also on specific experiences that arose when permitting inmates to self-select certain aspects of their day-to-day schedules. The Supreme Court has made clear that under such circumstances, trial courts must give "due deference to the experience and expertise of prison and jail administrators." *Cutter,* 544 U.S. at 717, 722-23.

Plaintiff's other arguments also lack merit. For instance, Plaintiffs argue that "Defendants cannot justify [their] failure to excuse Muslim inmates … [because] there is an overabundance of inmates relative to available details…and [] most institutions run at an 'idleness rate' [] of

---

[13] One of Plaintiffs' main arguments is that the Defendants' security concerns are not predicated on a formal "study," and that therefore the concerns are "speculation." Although Mize admitted that no formal study had been performed and that he therefore could not say for certain their concerns would come to fruition, he essentially was only admitting that he lacked a crystal ball. Mize Dep., p. 59-60. Mize specifically rejected the notion that the Defendants were "speculating…we're using some experience and good sound correctional judgment that we've used over years. We look at good order and operation consistently of a correctional facility that's operational 24 hours a day…" *Id.* at 59.

10-15%."  Doc. #59 at 12.[14]  But, as Mize explained in addressing this issue at his deposition, the question is not whether, through the Plaintiffs' preferred system, a prison's work will get done, but rather, whether enabling inmates to self-select which other inmates they will have access to, and when, creates potential security concerns.  Mize Dep. at p. 57.  The court also rejects the Plaintiffs' argument that "security" is a pretext because "inmates are routinely called out of work detail without adversely impacting institutional security."  Doc. #59 at 13, Ex. 16, Mintzes Report at 2.  Even if inmates were routinely "called-out" for other personal matters, that would not speak to Caruso's concerns about permitting inmates to self-select when they would have access to other inmates with whom they would not otherwise be able to interact.  At most, Plaintiffs' argument concerns whether the Work Release Policy is the least restrictive means of addressing the Defendants' security concerns, not whether those concerns exist in the first place.

In sum, Plaintiffs' position that "there are no valid security reasons for failing to accommodate *Jum'ah*," Doc. #59 at 13, is incorrect, and Defendants' security concerns constitute a compelling state interest.

> **c.** **A Material Question of Fact Exists as to whether the Work Release Policy is the Least Restrictive Means of Enforcing the MDOC's Compelling Governmental Interest in the Security of its Prisons**

The final prong of the RLUIPA analysis, in which the Defendants bear the burden of persuasion, is whether the Work Release Policy is the least restrictive means of addressing their security concerns. *Supra*, pp. 9-10.  The court finds a material question of fact exists on that issue.

Defendants advocate in favor of the Work Release Policy which prohibits inmates from

---

[14] Similarly, Plaintiffs posit that an "overabundance of inmates also establishes that, even if Defendants should not be required to grant inmates call-outs in order to attend *Jum'ah*, Defendants can and should be required to place Muslim inmates on work details that will not conflict with *Jum'ah*."  *Id.*, fn. 18.

being "released from work or school assignments to attend group religious services or activities, consistent with restrictions on attending other personal interest activities."   Work Release Policy, ¶ BB.   *See also id.*, ¶ V ("Staff shall not make special provisions for the observance of religious holidays except as authorized and specifically provided for by Department policy…").   Plaintiffs argue for a default position that is the polar opposite, suggesting that "Defendants could simply enact a policy recognizing that inmates have a right to attend bona fide religious services even if they are assigned to a conflicting work detail."   Doc. #59 at 13.

The court rejects Plaintiffs' proposed solution because granting inmates a "right to attend" religious services, even when they are otherwise assigned, ignores Defendants' legitimate security concerns discussed above.   Thus, it is not a feasible less restrictive alternative to the Work Release Policy.   That does not end the inquiry, though, because the Defendants bear the burden on this final prong of the RLUIPA analysis.   Importantly, Defendants are not arguing for a "zero-accommodation" policy where no religious-based scheduling requests should be accommodated.   Rather, their concern is that they not be required to accommodate *all* such requests, or any particular request they are not comfortable accommodating:

> …We attempt to accommodate [religious preferences] to the extent we can…certainly for the Muslim religion we offer group services…I know the facilities try to accommodate what they can accommodate…at an individual facility if they can accommodate various things informally and try and do their best, I don't have any problem with that.   But from overall that everyone's schedule has to be accommodated based on whatever they say their religion is [] not possible…I can't make some absolute guarantee…So, if I say you must accommodate every prisoners' religious needs in terms of schedules, I create a very dangerous environment in that prison.   I have to trust the wardens and their staff to know what they can accommodate and what they can't…If they have a prisoner whose entire life has sincerely held religious beliefs and they're making an attempt to accommodate, that's very different [than an insincere request]…It is discretionary.   That exists today…I think it's absolutely fair to say that [a sincere religious-based scheduling request] should be considered.   That doesn't mean it has to be

19

> approved based on any number of factors.   But I think that it should always
> be considered.   Yes.

Caruso Dep. at 11, 22, 54-58.

The testimony evidences the existence of a material dispute of fact on the least restrictive alternative question.   First, a disconnect appears to exist between Caruso's testimony and the Work Release Policy's directive that inmates "shall not be released from work or school assignments to attend group religious services or activities, consistent with restrictions on attending other personal interest activities."   Work Release Policy, ¶ BB.   Second, allowing religious-based scheduling accommodations only to the extent "other personal interest activity" accommodations are allowed, raises questions of its own.   Under RLUIPA, a heightened standard applies to substantial burdens placed on the practice of a religious exercise.   42 U.S.C. § 2000cc-3(g).   Thus, there is an inherent incongruity between RLUIPA's goals of protecting religious exercise and a government policy that treats a request to practice one's religion the same as a request to, say, watch a television program.   Moreover, the record is not at all clear what considerations drive a facility's decision to approve or disapprove scheduling requests, be they for religious or "other personal interest" reasons.   There may well be legitimate reasons – wholly unrelated to security – for a facility to deny an inmate's request to attend a non-religious "personal interest" activity, when that same reason might not suffice, under RLUIPA's heightened protections, to deny an inmate's legitimate request to attend a religious service.   Lastly, Defendants presented virtually no evidence of any considerations given to less restrictive alternatives, which further begs the question of whether any reasonably exist.[15]   *See Warsoldier v.*

---

[15] As noted, Caruso distinguished between inmates who have long histories of sincerely practicing a particular religion (presumably without posing the security issues about which Defendants are concerned) and ones she described as "Johnny Come Latelys."   Caruso Dep. at 56-57.   Yet,

*Woodford*, 418 F.3d 989, 999 (9th Cir.2005) (defendant "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.") (citing *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 824 (2000) (noting, in the First Amendment context, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective.")).

In sum, even assuming the consideration of inmates' religious-based scheduling requests must be made on essentially a case-by-case basis[16], Defendants have not shown that doing so using the same criteria that would apply to an inmate's request to watch a television program is the least restrictive means of protecting their compelling interests in prison security. Accordingly, summary judgment is not appropriate on Plaintiffs' *Jum'ah* claim under RLUIPA.

### ii.    Plaintiffs' *Halal* Diet Claims

#### a.    Failing to Provide Muslim Inmates a *Halal* Diet Substantially Burdens a Religious Exercise, but a Question of Fact Exists as to whether Plaintiffs Receive Such a Diet

Plaintiffs argue that as observant Muslims, they are entitled to a *halal* diet, *i.e.*, one that is not "haram" in any respect. They also argue that even the non-meat foods served to

---

Defendants offered no evidence or argument as to why such distinctions (or other inmate characteristics, *see* Mize Dep. at 64) would not be a basis for a less restrictive alternative to the current form of the Work Release Policy.

[16] Since the court rejects Plaintiffs' position that inmates have a "right" to attend religious services even when they are otherwise assigned to work or school details, Defendants' argument about administrative impossibilities of having to accommodate all requests to attend religious services is irrelevant. Doc. #55 at 8. Moreover, the record shows that the Defendants can and do consider "detail release" requests on a case-by-case basis. Thus, Defendants' professed administrative concerns do not alter the court's overall analysis. Similarly, Defendants' concern about accommodating inmates who make insincere requests, *id.*, cannot support an argument that the Work Release Policy is the least restrict means of addressing the Defendants' concerns because, as the Supreme Court made clear in *Cutter*, 544 U.S. at 725, fn. 13, prison officials retain the right to deny any request that they find to be "insincere."

*halal*-observing inmates must be "prepared in a separate kitchen and with separate cooking tools…" so that they are not "cross-contaminated" with non-*halal* meat or other non-*halal* foods. Doc. #59 at 3.   Defendants contend that although the MDOC does not provide special *halal*-meals, it takes "extensive measures" to prevent cross-contamination of foods served to Muslim inmates with foods that are haram.   Doc. #60 at 7.

Plaintiffs' expert, Imam Abdulla El-Amin, opines that "[t]he Quran requires that Muslims consume only *Halal* food items," that "[f]ood is not *Halal* if it is cross-contaminated," and that "[a] 'no meat' or vegetarian menu is not always *Halal*."   Doc. #57, at Ex. 9 (the "El-Amin Report"), pp. 4-5.   If true, then a prison's failure to provide observant inmates a *halal* diet would substantially burden their religious exercise.   *See e.g., Hudson* v. *Dennehy*, 538 F.Supp.2d 400, 411 (D. Mass. 2008) (prison's "refusal to provide a daily Halal menu to Muslim inmates substantially burdens plaintiffs' exercise of their religious beliefs by creating pressure on plaintiffs to consume meals that do not conform with their understanding of the requirements of Islamic law."); *Thompson v. Williams*, 2007 WL 3244666, at *19 (W.D. Wash. Oct. 31, 2007).

Defendants do not necessarily disagree with Plaintiffs' general proposition, but instead contend that they provide a non-meat diet that "meets their religious requirements," *i.e.*, one which is *halal* and not *haram*.   Doc. #55 at 10 (citing Ex. 4, Expert Report of Chaplain Mardini, ¶9)[17]; Caruso Dep., pp. 27-28; Mize Dep., p. 52; Doc. #57-3, Martin Dep., p. 43.   More specifically, Defendants contend that while they may not offer a special "*halal* meal" to Muslim inmates, Doc. #60 at 6, they offer vegetarian/protein substitute food options which are *halal*.   *Id.*; Doc. #55 at 17, Ex. 4, ¶9 (claiming that Plaintiffs may "simply self-select vegetables and a protein substitute"

---

[17] Plaintiffs dispute the foundational sufficiency of Chaplain Mardini's affidavit.   Doc. #59 at 10, fn. 16.

from the standard MDOC menu as "an alternative means to exercise their decision to eat *halal* meals," and that if prisoners "choose the non-meat choice which meets all the nutritional dietary requirements for the meal," it "would be an acceptable choice under Islamic jurisprudence.").

Citing to a variety of first-hand evidence, Plaintiffs disagree with the Defendants' factual assertion about the foods available to them, claiming that "the current meal options do not conform with halal because even the foods that could be halal are cross-contaminated with haram." *See* Doc. #58, Pls.' Stmt. of Material Facts, ¶68 (citing deposition testimony); Doc. #57 at 15; Ex. 5 (Traini Dep.) at 42-43; Ex. 6 (Dowdy-El Dep.) at 46-47; Ex. 8 (Salem Dep.) at 15-17; Doc. #59 at 18. In response, Defendants offer the affidavit of Brad Purves (Doc. #55-8, "Purves Aff."), a Foodservice Manager for MDOC, stating that "Purves' affidavit addresses the Muslim Plaintiffs' concerns with cross-contamination and details the extensive measures that the MDOC takes to prevent cross-contamination of food." Doc. #60 at 7. However, Purves simply avers: "In order to prevent cross contamination, the Department follows a HACCP plan (Hazard Analysis and Critical Control Point) (Exhibit 7B). This is a comprehensive prevention-based *food safety system that identifies and monitors specific food safety hazards that can adversely affect the safety of food products.*" Purves Aff., ¶7 (emphasis added). It thus appears that the contamination the MDOC is addressing is that which might pose a "food safety hazard," and it is unclear whether (or how) the MDOC's efforts ensure that the type of cross-contamination about which Plaintiffs complain – vegetarian food that otherwise would be *halal* being mixed with or exposed to food that is *haram* – does not occur. Indeed, the HACCP Plan referenced by Mr. Purves specifically defines "contamination" as referring only to the "unintended presence in food of potentially harmful substances, including micro-organisms, chemicals, and physical objects." Doc. #55-10, Ex. B to Purves Aff. Finally, although Purves avers that the MDOC "cooks and

23

serves meat and vegetarian entrees separately," and refers to PD 04.07.100," Purves Aff., ¶10; Doc. #55-9, the Plaintiffs, based on the above-cited deposition testimony, presented sufficient evidence to raise a question of fact as to whether that is the case in practice.

The foregoing shows the existence of a material question of fact about whether the Plaintiffs are, in fact, able to obtain a diet that conforms with their religious requirements, and thus whether the MDOC's challenged food service plan constitutes a substantial burden on Plaintiffs' ability to exercise their religion.

> **b.     A Question of Fact Exists as to whether Defendants' Cost Concerns Constitute a Compelling Governmental Interest**

Despite the question of fact as to the first prong of the RLUIPA analysis, the court continues its analysis, because, even if Plaintiffs established that they do not receive a *halal* diet, Defendants could still be entitled to summary judgment if they could show that the challenged burden furthers a compelling governmental interest, and is the least restrictive means of achieving that compelling interest.   42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b).   The court agrees with Defendants that a substantially increased cost associated with providing special meals, *e.g., halal* meals, to one group of inmates could be a compelling governmental interest under RLUIPA. *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007).   However, they have not made a sufficient factual showing on that point to be entitled to summary judgment.

Defendants first state that the "Court is no doubt aware of the serious budget crisis facing the State of Michigan" and ask the court to presume that providing *halal* meals would be cost prohibitive.   Doc. #55 at 11.   But Defendants provide no authority for the court to take judicial notice of the State's and the MDOC's specific finances, and the court declines to do so.

Second, Defendants Purves' affidavit as evidence establishing a "valid, rational

24

connection" between MDOC's refusal to provide *halal* meals for Muslim inmates and the "legitimate governmental interest put forward to justify [the policy]": namely, the allegedly prohibitive cost of offering that diet.  Doc. #55 at 11, 17; Purves Aff.; Doc. #60 at 7.  Purves avers that he has "reviewed information on the internet from Halal vendors," and that the information indicated that the cost of one Halal entree is, on average, 4 to 6 times that of one entree from the "regular meal line."   Purves Aff. at ¶9.   He further notes that "[p]er meal costs associated with the Halal meal do not include the additional costs that would be necessary to establish a separate food preparation area for Halal meals."   *Id.*

The court finds numerous problems in accepting the Defendants' position at the summary judgment stage.  First, Purves' affidavit is based largely on "information on the internet" drawn from unidentified sources, which information appears to be inadmissible hearsay.  *See U.S. Structures*, 130 F.3d at 1189; Doc. #57, Exs. 18-20.[18]   Second, and relatedly, it can hardly be said that Purves' affidavit (or other evidence in the record) establishes the MDOC's financial inability to provide halal meals to its Muslim inmates.   At most, the MDOC has shown that providing *halal* meals is more costly than providing a general population meal.   *See fn. 18;* Martin Dep. at 33-34. But that alone does not establish that it is incapable, financially, of providing *halal* meals, and in

---

18 It does appear that in 2009, the MDOC conducted a survey finding that at least six other states provide a *halal* diet for Muslim inmates, at costs ranging from $1.75 per meal in Massachusetts to $4.00 per meal in Hawaii.   *See* Doc. #57, Ex. 15 ("Corrections State Departments Halal Survey"). They also presented some evidence of ongoing research on the matter and a related state-wide prison menu change.   Caruso Dep. at 25-26; Mize Dep. at 49-51, 53; Doc. #57-3 ("Martin Dep.") at 15-17.   In fact, Michael Martin, the MDOC's Special Activities Coordinator, testified that the issue of whether the MDOC should or could provide a *halal* diet to observant Muslim inmates was being discussed at the time the instant lawsuit was filed.   Martin Dep. at 14-17.   The Chaplain Advisory Council which Martin was involved with, which does not have final say on the matter recommended that a *halal* diet be approved.   *Id.* at 15.   Thus, there is at least some evidence in the record of Defendants having studied the issue.

fact, it appears that higher-cost meals are provided to certain other inmate groups.[19]    Finally, in a point that may equally go to the "least restrictive alternative" question, and as discussed above, a question of fact exists as to whether currently-provided vegetarian foods are prepared and served to Muslim inmates in a manner that conforms with *halal* requirements – that is, that they are not cross-contaminated with *haram* foods.   If Defendants' current efforts are found to be ineffective in that regard, then, in order to prevail on summary judgment, Defendants would need to show that any additional such measures would be cost-prohibitive.   Yet, they made no such showing here.

In sum, though a question of fact exists as to whether Defendants' professed cost concerns constitute a compelling governmental interest, even if the court found that to be the case, it would still find questions of fact regarding: (1) the Defendants' ability to provide *halal* meals; and (2) regardless of the answer to that question, whether the current system is the least restrictive means of addressing Defendants' concerns.   To that end, the court notes that RLUIPA specifically contemplates that "this [Act] may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."    42 U.S.C. §2000cc-3(c). Accordingly, summary judgment is not appropriate on Plaintiffs' *halal* diet claim under RLUIPA.

---

[19] Plaintiffs note that the MDOC currently provides "special religiously-based diets to Jewish, Buddhist and Hindu inmates at a per meal cost in excess of the meal options offered to all other inmates."   Doc. #59 at 6; Doc. #57, Ex. 18 ("Per Capita Costs of Traditional Menu" ($2.49 per day)), Ex. 19 ("Strict Vegetarian Statewide Menu" ($3.12 per day)), Ex. 20 ("Kosher Weekly Menu" ($7.47 per day)).   According to Plaintiffs, MDOC's provision of those alternative diets at increased cost undermines Defendants' suggestion that "offering a *halal* diet would 'impact security by diverting resources that could be used to pay officers' salaries.'"   Doc. #59, at 6; Doc. #55 at 11.   While the court finds that the present evidence is inconclusive on the Defendants' position that providing *halal* meals would be cost-prohibitive, it does not agree that the evidence establishes that the MDOC's cost-containment interest cannot be compelling or that the MDOC's position is based on "willful ignorance."   Doc. #57 at 10.   *Hudson*, 538 F.Supp.2d 400, does not help Plaintiffs' position because, as they admit, the defendant in that case "did not raise cost as a basis for not providing halal meals."   *Id.* at 9.

**B.**      **Cross-Motions for Summary Judgment on Plaintiffs' Free Exercise Claims**

That certain material questions of fact make summary judgment on Plaintiffs' RLUIPA claims inappropriate does not necessarily compel the same conclusion with respect to their First Amendment claims.  This is because "[t]he RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is reasonably related to legitimate penological interests."  *Smith v. Perlman*, 2012 WL 929848, at * 9 (N.D.N.Y. Mar. 19, 2012) (quoting *Griffin v. Alexander*, 2011 WL 4402119, at *10 (N.D.N.Y. Aug. 25, 2011).  *See also Hayes*, 424 Fed. Appx. at 554 (noting that RLUIPA "expands the First Amendment protections accorded prisoners with respect to their religious beliefs…"); *Colvin v. Caruso*, 605 F.3d 282, 296 (6th Cir. 2010) ("The constitutional protection afforded [to inmates] under § 1983 is less strong" than those afforded under RLUIPA) (citing *Lovelace v. Lee*, 472 F.3d 174, 199–200 (4th Cir. 2006) (holding that "the First Amendment affords less protection to inmates' free exercise rights than does RLUIPA")).

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. Amend. I.  The First Amendment is applicable to the States through the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  The Supreme Court has made clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  Such persons "clearly retain protections afforded by the First Amendment…including its directive that no law shall prohibit the free exercise of religion."  *Id.* (citations omitted).

That right is subject, of course, to the unique challenges of running a penal system.  *Id.*

27

"Because 'the problems of prisons in America are complex and intractable,' and because courts are particularly 'ill equipped' to deal with these problems, [courts] generally have deferred to the judgments of prison officials in upholding [prison] regulations against constitutional challenge." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (*quoting Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)); *see also Hayes*, 424 Fed. Appx. at 550.  The "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *Id.* (quoting *Bell*, 441 U.S. at 562).  Thus, with respect to First Amendment claims, a plaintiff inmate "bears the burden of 'overcom[ing] the presumption that the prison officials acted within their broad discretion.'" *Hayes*, 424 Fed. Appx. at 550 (quoting *Shaw*, 532 U.S. at 232).

Accordingly, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  *O'Lone*, 482 U.S. at 349 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977).  *See also Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985) ("[A] court must balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons.").  Put succinctly, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Under *Turner*, in determining the reasonableness of the regulation at issue, four factors come into play:

> (1) whether there exists a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it,"

(2) whether there are "alternative means of exercising the right that remain open to prison inmates,"

(3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and

(4) the availability of a "ready alternative…that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests."[20]

*Turner*, 482 U.S. at 89-91.   A "trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors."   *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999). Rather, the four factors are "simply 'relevant' to the ultimate inquiry a court must undertake" in "determining whether a prison regulation is 'reasonably related to legitimate penological interests.'"   *Id.* (quoting *Turner*, 482 U.S. at 89).

###### i.        Plaintiffs' *Jum'ah* Claims and the Work Release Policy

The court agrees with Defendants that, under the applicable "reasonableness" test, the Work Release Policy passes First Amendment muster.   The first *Turner* factor, which requires only a "valid, rational connection" between the challenged rule and the governmental interest, is squarely in Defendants' favor.   As discussed in detail above, *supra*, pp. 15-18, Defendants have articulated a compelling governmental interest in prison security that is advanced by the Work Release Policy.   Moreover, because the challenged rule addresses a legitimate security concern of the State's prisons, the court finds this factor to be the single most compelling in its analysis.

The second factor – whether Plaintiffs have an alternate means of exercising the right in issue – also favors Defendants.   Plaintiffs argument, that they "have no alternative way to celebrate Jum'ah" under the Work Release Policy, Doc. #59 at 19, is based on an overly-literal

---

20 The *Turner* Court noted that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."   *Turner*, 482 U.S. at 90-91.

interpretation of the factor.   The U.S. Supreme Court has made clear that the real consideration is not whether there exists a religiously-equivalent substitute for the particular practice in question, but rather whether affected inmates have some other meaningful opportunities to practice their religion.   *See O'Lone*, 482 U.S. at 351-52.   Indeed, *O'Lone* made this point with respect to the very *Jum'ah* prayer at issue in this case:

> There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time.   But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service.   While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end.   In *Turner*, we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of "all means of expression."   Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.

*Id.*   Here, even if Plaintiffs cannot participate in *Jum'ah*, they appear to retain the ability to practice their religion in other meaningful ways.   For example, they apparently may participate in multiple (5 times a day) other daily prayers and in the month-long Ramadan observance.   *See* Doc. #58-10, MDOC Handbook of Religious Groups at 10-11; Dowdy Dep., p. 14 (noting that he had just "finished Ramadan," the observance of which is not at issue in this case); Caruso Dep. at 12.   While those facts alone are sufficient to tilt this factor in Defendants' favor, it also appears (at least since the Memo's adoption) that Muslim inmates have been permitted to participate in the *Eid* Feasts.   *See infra*, p. 37.

The third factor favors Defendants.   As discussed above, *supra*, pp. 15-18, Plaintiffs' argument that accommodating their desires would not negatively impact the guards or other inmates is simply not correct.   The fourth factor is fairly neutral.   While the court has found that a

30

question of fact exists as to whether the Work Release Policy is the least restrictive means of addressing Defendants' security concerns, Plaintiffs have not identified a workable solution that can be implemented at a *de minimus* cost.  *See supra*, p. 19.

Overall, and particularly in light of the court's analysis of the first factor, the court finds the Work Release Policy is reasonable and does not violate the Plaintiffs' First Amendment rights. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' related claim.

### ii.    Plaintiffs' *Halal* Diet Claims

The material questions of fact that exist with respect to Plaintiffs' *halal* diet claims under the RLUIPA also drive the court's analysis of the same claims under the First Amendment.   As to the first factor, cost issues could certainly have a "valid, rational connection" to the challenged meal plan offered by the MDOC.  *See Turner*, 482 U.S. at 89-91; *Cutter*, 544 U.S. at 723; *Shakur v. Schriro*, 514 F.3d 878, 886 (9th Cir. 2008) (legitimate governmental interest in running a "simplified food service"); *Williams v. Morton*, 434 F.3d 212, 217-19 (3rd Cir. 2003) (holding that a "prison's legitimate interests in simplified food service [and] operating within budget constraints" were reasonably related to the practice of offering Muslim inmates with "vegetarian meals that complied with *halal* rules," but declining to offer *halal* meat as an element of the menu). However, while Defendants presented some evidence on that point, it was not enough to establish their entitlement to summary judgment.   The court places the same primary emphasis on this factor here as it did above with respect to Plaintiffs' Work Release Policy claim.   Thus, with the factual questions that predominate, this factor, at least at this time, is fairly neutral, and weighs in favor of allowing Plaintiffs' First Amendment *halal* diet claim to go forward.

The second factor favors Defendants for the same reasons as stated above with respect to the Work Release Policy claim.   That is, Plaintiffs again take too narrow a view of the second

31

factor and simply conclude that they "have no way to obtain a halal diet if prison officials refuse to provide one."  Doc. #59 at 18.  But, as noted above, the second factor examines not whether the Plaintiffs are able to engage in a religiously equivalent practice to the one in issue, but rather, whether they are able to practice their religion in other meaningful ways, which they are.  *See O'Lone*, 482 U.S. at 351-52; *supra*, pp. 30-31.[21]

On the present record, the third and fourth factors are either neutral or favor Plaintiffs. While Defendants presented some evidence that providing *halal* meals would be more costly than providing regular meals, they did not present sufficient evidence on this topic for the court to conclude that doing so would be cost-prohibitive.  *Supra*, pp. 25-26.  And, even if the MDOC is unable to provide specific *halal* meals without unreasonably diverting assets needed for some other important interest, there is at least a question of fact as to whether they do provide, or could provide, non-*haram* food to Plaintiffs by simply ensuring that there is no cross-contamination of *haram* food with vegetarian dishes that would otherwise be *halal*.  *See supra*, p. 26.  *See also Turner v. Bolden*, 8 Fed. Appx. 453, 456 (6th Cir. 2001) (vacating, in part, the entry of summary judgment in favor of MDOC on a Free Exercise claim because "[t]here [was] insufficient evidence in the record regarding the burden [the plaintiff's] requests would place on prison resources, or the existence of any alternatives which might satisfy his religious requirements").

For the foregoing reasons, the parties' cross-motions for summary judgment on Plaintiffs' *halal* diet claims under the First Amendment should be denied.

---

[21] Defendants' suggestion that the Plaintiffs may "simply self-select vegetables and a protein substitute" from the standard MDOC menu as "an alternative means to exercise their decision to eat *halal* meals," is no answer given the cross-contamination question discussed above.  *Supra*, pp. 23-24.

**C.      Cross-Motions for Summary Judgment on Plaintiffs' Equal Protection Claims**

The Fourteenth Amendment's Equal Protection Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Plaintiffs admit that to prevail on their equal protection claims, they must first show that they have "been treated differently from persons who are similarly situated" to them. Doc. #57 at 18. However, Plaintiffs understate the applicable standards in two respects. First, Plaintiffs must show not only different treatment, but that the Defendants "intentionally discriminated against [them] and that their behavior was motivated by purposeful discrimination." *Abdullah v. Fard*, 173 F.3d 854 (6th Cir. 1999) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Second, it is not enough for Plaintiffs to be merely "similarly situated" to the ones whose treatment they desire. Rather, they must be similarly situated "in all material respects." *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. Appx. 826, 836 (6th Cir. 2009). The parties also disagree as to the overarching standard that applies assuming the Plaintiffs clear these initial hurdles. Plaintiffs urge "strict scrutiny," Doc. #57 at 18, whereas Defendants contend that the "standard by which prison regulations impinging on prisoner religious rights is judged is the reasonableness standard set forth in *O'Lone…*" Doc. #63 at 3. Assuming the court reaches that matter, Plaintiffs are correct:

> An equal protection claim is subject to rational basis review unless it involves infringement of a fundamental right or application to a suspect class…Strict scrutiny applies where the classification affecting eligibility for benefits is based on religion or burdens the exercise of religion.

*Bowman v. U.S.*, 304 Fed. Appx. 371, 378 (6th Cir. 2008). *See also Sareini v. Burnett*, 2011 WL 1303399, at *7 (E.D. Mich. Mar. 31, 2011) (strict scrutiny applied because the Muslim plaintiffs

33

showed a distinction between their treatment and the treatment of Jewish inmates).   *Id.*

i.        **Plaintiffs'** *Jum'ah* **Claims and the Work Release Policy**

Plaintiffs cannot clear the initial equal protection hurdle with respect to their *Jum'ah* claims because they are not similarly situated in all material respects to the prisoners who they claim were treated more preferentially.   In Plaintiffs' summary judgment brief, they state simply that "there is no genuine dispute that [they] are subject to disparate treatment with respect to *Jum'ah*.   Inmates are permitted to leave work detail for Passover Seder but the same respect is not extended to *Jum'ah*."   Doc. #57 at 19.

Plaintiffs' position is fatally flawed.   Passover Seder is a religious event that takes place once a year whereas *Jum'ah* is a group prayer event that takes place weekly throughout the year. Doc. #58, ¶¶ 13, 22.   As discussed above, the Defendants identified certain valid security and administrative concerns that would result from accommodating Plaintiffs' request.   Even assuming that those same concerns exist with permitting Jewish inmates to attend Passover Seder, a weekly accommodation is simply not comparable to one that happens once a year; the former clearly and necessarily presents increased administrative difficulties and greater opportunity for Defendants' security concerns to come to fruition.   Those differences lead to the conclusion that, at least for purposes of Plaintiffs' instant equal protection claim, they are not similarly situated "in all material respects" to the Jewish inmates who are permitted to attend Passover Seder.   *Taylor Acquisitions*, 313 Fed. Appx. at 836.   *See also*, *Rider v. Yates*, 2009 WL 3618158, at *5 (E.D. Cal. Oct. 29, 2009) ("If the burden imposed by one prisoner's religion exceeds the burden imposed by another prisoner's religion, those prisoners are not similarly situated and do not implicate an equal protection claim.") (citing *DeHart v. Horn*, 390 F.3d 262, 272 (3rd Cir. 2004)); *Clark v. Banks*, 193 Fed. Appx. 510, 515 (6th Cir. 2006) (finding that general education and special education

34

students who seek the same opportunity to participate in the school of choice program were not "similarly situated" for purposes of an equal protection analysis because it was more costly to accommodate the special education student than the general education student).

While the above analysis alone entitles Defendants to summary judgment on Plaintiffs' Equal Protection challenge to the Work Release Policy, summary judgment would also be appropriate because Plaintiffs failed to present any evidence that the Work Release Policy was being used to intentionally discriminate against them. *Abdullah*, 173 F.3d 854. The Policy is facially neutral, and Plaintiffs admit that it is applied on a case-by-case basis. *See supra*, p. 4. The fact that Jewish inmates are allowed to attend a once-a-year religious event is not evidence that Plaintiffs' request to attend weekly *Jum'ah* services was rejected out of any animus by the Defendants' against Muslims or the Islamic religion. And, although the Plaintiffs correctly note that in some instances "an invidious discriminatory purpose" can be inferred from the totality of the relevant facts, Doc. #59 at 15, they simply have not put forth sufficient ***facts*** for the court to make that inference here.

### ii.    Plaintiffs' *Halal* Diet Claims

Summary judgment in Defendants' favor is also proper as to Plaintiffs' *halal* diet claims. Once again, the Muslim Plaintiffs point to the Jewish inmates who receive Kosher meals as a similarly situated group of prisoners receiving different treatment. Doc. #57 at 19. Certainly, if the Defendants voluntarily provided Kosher meals to Jewish inmates, then, assuming (though the court makes no such finding here) that the cost of Kosher and *halal* meals is roughly equivalent, it would appear that the Plaintiffs are "similarly situated" to the Jewish inmates with respect to the former group's religious-based dietary requests. However, the Defendants did not voluntarily

35

provide Kosher meals to Jewish inmates, but rather, did so only pursuant to court order:

> Q.      In other words, the MDOC prior to the court order did not voluntarily
>         undertake the task of providing Kosher food to Jewish inmates?
>
> A.      I think that's fair to say.   Yes.

Caruso Dep. at 29-30.   *See also* Mize Dep. at 48; Martin Dep. at 33.   Since the MDOC provided

Kosher meals to the Jewish inmates only after they had a court order in hand establishing their

lawful entitlement to such a special dietary accommodation, the Plaintiffs here, lacking such an

order, cannot show that they are presently similarly situated "in all material respects" to the Jewish

inmates.   For that reason alone, summary judgment in Defendants' favor is appropriate.

Moreover, even assuming the Plaintiffs are considered to be similarly situated to the

Jewish inmates who receive a Kosher diet, Defendants would still be entitled to summary

judgment because Plaintiffs failed to present any evidence that Defendants' failure to provide

*halal* meals to Muslim inmates was motivated by a discriminatory purpose.   First, as noted in the

preceding paragraph, Defendants did not provide Kosher meals out of a preference for the Jewish

faith, but because they were ordered to do so by a court.   Thus, the Defendants' provision of

Kosher meals but not *halal* meals is not evidence of an anti-Muslim sentiment.   Second, although

Defendants did not present sufficient evidence regarding costs to show they were entitled to

summary judgment on Plaintiffs' RLUIPA or First Amendment claims, they did present some

such evidence.   *Supra*, pp. 25-26, fn. 18.   Third, although the parties dispute the sufficiency and

efficacy of Defendants' efforts, it does appear that they have taken at least some steps to attempt to

provide Plaintiffs with vegetarian options that are not cross-contaminated with meat or other

*haram* food substances.   *See e.g.*, Dowdy-El Dep. at 45-47; Caruso Dep. at 27-28.   Lastly,

Plaintiffs presented no direct evidence of any invidious purpose or discriminatory motive related

36

to the Defendants' refusal to provide *halal* meals to the Plaintiffs, and the foregoing analysis shows that Plaintiffs have not put forth sufficient facts to allow an inference of a discriminatory purpose.

**D.     Cross-Motions for Summary Judgment on Plaintiffs' Claims Regarding the *Eid* Feasts**

Plaintiffs, under RLUIPA and the First and Fourteenth Amendments, urge the court to issue an order directing Defendants to permit Plaintiffs to celebrate the *Eid* Feasts.   There seems to be no dispute that at the time this action was commenced, at least some of the Plaintiffs, some of the time, were not permitted to participate in the two *Eid* Feasts.  *See e.g.*, Doc. #60 at 8. However, on December 10, 2010, the MDOC issued its Memo clarifying to all its prison facilities:

> …in compliance with Policy Directive 05.03.150, "Religious Beliefs and Practices of Prisoners", holiday observances and group services must be provided to meet at least the minimum requirements for each authorized religious group (see Attachment A of PD 05.03.150).  The Handbook on Religious Groups [] is your reference for minimum requirements for prisoners...For Muslim prisoners, the Handbook on Religious Groups identifies TWO religiously required observations – Eid-ul-Fitr and Eid-ul-Adha – for group worship.[22]    Please ensure that this minimum requirement for Muslim prisoners is met in compliance with policy…

Doc. #55, Ex. 3.

Defendants argue that by issuing the Memo, any case or controversy related to the *Eid* Feasts was extinguished, rendering Plaintiffs' claims on those matters moot.  Doc. #55 at 11 (claiming the issue is moot because the "MDOC allows for the celebration of both Eids" and citing the Memo).   Plaintiffs, on the other hand, argue that the issue is not moot because the Memo "is not official MDOC policy and is subject to reversal at any time" and because it "does not address

---

[22] Specifically, the Handbook states: "Muslims are required to observe the following two obligatory festivals: a. Eid-ul-Fitr…b. Eid-ul-Adha."    Doc. #57-11 at 6.

whether inmates may observe the *Eid* feasts when they have a conflicting work detail."   Doc. #66 at 2.

"The issue of mootness implicates the court's subject matter jurisdiction inasmuch as federal courts are limited by Art. III of the Constitution to deciding cases and controversies." *Mosley v. Hairston*, 920 F.2d 409, 414 (6th Cir. 1990).   Only "live" controversies which persist in "definite and concrete" form even after intervening events have altered the parties' circumstances satisfy this requirement.   *Id.* (citing *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974).   A defendant's "voluntary cessation of a challenged practice" does not automatically moot a case. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008) (quoting *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003) and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000)).   Rather, a claim is only moot where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003)).

Although a defendant's burden in this regard is "heavy," *Akers*, 352 F.3d at 1035, the Sixth Circuit, like others, has been more accepting when it is the government, rather than a private party, that has voluntarily ceased the challenged conduct.   *League of Women Voters*, 548 F.3d at 473-74; *Mosely*, 920 F.2d at 415 (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("…cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by courts than similar action by private parties.   According to one commentator, such self-correction provides a secure foundation for dismissal based on mootness so long as it appears genuine.") (citing 13A Wright, Miller & Cooper *Federal Practice and Procedure*, § 3533.7, at 353 (2d ed. 1984)).

Thus, the question before the court is whether, after the MDOC's issuance of the December

38

10, 2010 Memo, there remains a "definite and concrete" controversy about the Plaintiffs' prospective rights to participate in the *Eid* Feasts.   If so, the claims are properly before this court, but if not, they are "moot" and the court lacks jurisdiction to consider them.   The court finds that although the Defendants concede the Plaintiffs' right to participate in the *Eid* Feasts, Doc. #55 at 11 and Ex. 3, the issue is not legally moot under the relevant facts and the above legal standards.

Policy Directive 05.03.150(YY) specifically states: "Special religious meals and food items shall be provided to prisoners only as set forth in this section."   Policy Directive, ¶YY. Importantly, the Policy Directive lists specific religious meals/observances that are permitted, including, for example, "an annual Passover Seder," *id.*, ¶WW, and "religious fasts that are necessary to the practice of their religion, as approved by the CFA Special Activities Coordinator, *id.*, ¶XX.   Thus, the Policy Directive makes clear that to be allowed, the "special religious meals" must either be mentioned specifically in the Policy Directive (such as the Passover Seder) or at least incorporated therein by reference (such as religious fasts approved by the CFA Special Activities Coordinator).

Neither condition is satisfied with respect to the *Eid* Feasts.   The Policy Directive does not reference the *Eid* Feasts, either explicitly or by reference to the Memo.   Defendants presented no argument whatsoever as to why, notwithstanding their stated conclusion that Muslim inmates may participate in the *Eid* Feasts, the Policy Directive has not been amended to reflect that decision.

Accordingly, because the Defendants opposed Plaintiffs' request for summary judgment only on mootness grounds, and because their Memo and briefs make clear that they have no objection to permitting observant Muslim inmates to participate in the *Eid* Feasts, the court recommends granting Plaintiffs' instant motion on their related claims, and denying Defendants' motion on those claims.

39

IV.   **CONCLUSION**

For the foregoing reasons, the court **RECOMMENDS** that:

1.  Defendants' Motion for Summary Judgment [55] be **GRANTED** as to the following claims:

    -   Plaintiff Hunt's claims;

    -   Muslim Plaintiffs' *Jum'ah* and *halal* diet claims under the Equal Protection Clause of the Fourteenth Amendment and under Article I, §2 of the Michigan Constitution; and

    -   Muslim Plaintiffs' *Jum'ah* claim under the Free Exercise Clause of the First Amendment and under Article I, §4 of the Michigan Constitution.

2.  Defendants' Motion for Summary Judgment [55] be **DENIED** as to the following claims:

    -   Muslim Plaintiffs' *Jum'ah* and *halal* diet claims under the RLUIPA;

    -   Muslim Plaintiffs' *halal* diet claims under the Free Exercise Clause of the First Amendment and under Article I, § 4 of the Michigan Constitution; and

    -   Muslim Plaintiffs' *Eid* Feasts claims.

3.  Plaintiffs' Motion for Summary Judgment [57] be **GRANTED** as to their *Eid* Feast claims, but **DENIED** as to all of their other claims.


Dated: July 24, 2012                                    s/David R. Grand_____
Ann Arbor, Michigan                                    DAVID R. GRAND
                                                       United States Magistrate Judge


**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).   Failure to timely file objections constitutes a waiver of any

further right of appeal.   *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).   Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.   *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   Copies of any objections must be served upon the Magistrate Judge.   *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.   *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).   Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 24, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager